

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

DSS:CAC
F.#2010R00897

*271 Cadman Plaza East*
*Brooklyn, New York  11201*

June 6, 2011

**BY HAND DELIVERY AND ECF**

The Honorable Nicholas G. Garaufis
United States District Court
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:  United States v. John Micali,
           Criminal Docket No. 10-005 (NGG)

      The government submits this letter in response to the defendant John Micali's sentencing letter, dated May 31, 2011 (Def. Ltr.).  For the reasons set forth below, the applicable United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") range set forth in the Presentence Investigation Report ("PSR") of 24 to 30 months of incarceration is correct and a sentence within that range is appropriate.

I. <u>Background</u>

      On December 10, 2010, the defendant pleaded guilty to conspiring to steal cargo from John F. Kennedy Airport ("JFK"), in violation of 18 U.S.C. § 659, which carries a maximum term of imprisonment of 10 years, and no minimum.  (PSR ¶ 1).  The defendant was employed by JRS Trucking Service Inc., which provides services within JFK Airport.  (PSR ¶ 70).  JRS Trucking subcontracts its workers to various companies within JFK.  In this case, the defendant was subcontracted to the export division of United States, Inc. ("UTi"), an import and export company.  (PSR ¶ 2).

      On November 21, 2009, UTi learned that a shipment of Blackberry Storm and Apple iphones to India arrived with only a portion of the merchandise.  (PSR ¶ 4).  In place of the merchandise were diapers.  The weight of the package appeared to

1

be normal given the amount of diapers inside of it. (Id.) The India recipient notified UTi, and UTi was able to track the package. It then reviewed the video surveillance of the shipping room from November 18, 2009, the day that the package was sent to India. A similar package of Apple iphones sent to Singapore was also missing merchandise.

The videotape from that date showed the package to India on pallets. The defendant and his co-defendants then walked into the warehouse, stood around the boxes destined for India and Singapore containing the electronics and then walked into a nearby room. The videotape next showed the defendant and his co-defendants bringing weighted black plastic bags out of the janitor room, placing the boxes back onto the pallets, and putting the bags onto a forklift. It also showed an empty diaper box next to the pallet. Lastly, the videotape showed one of the defendant's co-defendants place a weighted black plastic bag into the trunk of a white vehicle parked outside of the warehouse. The vehicle is registered to the defendant's wife, and the videotape shows the defendant drive the vehicle away from the warehouse.

The pallet with the Indian shipment also had another box containing Apple iphones scheduled for delivery to Singapore. Similarly, these boxes arrived at Singapore with only a portion of the iphones in the box, and diapers in place of the remaining portion. The videotape surveillance shows the defendants take the Singapore shipment into the same janitor room, and then bring out weighted plastic bags and place them onto a forklift.

Further investigation revealed additional thefts by the defendant and his co-defendants, including the theft of expensive french cream and leather jackets, which brought the total loss to $97,502.[1]

II. Criminal History

As is more fully described in the PSR, the defendant has a lengthy criminal history spanning from 1993 through 2009, including multiple violations of supervised release.

On January 14, 1994, the defendant was convicted in the

---

[1] Although the defendant's sentencing letter initially included an objection to that loss calculation, the defendant subsequently withdrew that objection.

Eastern District of New York of conspiracy to distribute cocaine. The defendant purchased cocaine from Brooklyn suppliers, who obtained the drugs from couriers from Texas, and the defendant in turn distributed the cocaine to his own customers.  The defendant was specifically responsible for at least 500 grams of cocaine, while the conspiracy as a whole distributed between 60 and 80 kilograms of cocaine.  The defendant was sentenced to 30 months' imprisonment and 3 years supervised release.  (PSR ¶ 25-26).

On July 3, 1993, while the defendant was on bail for the above-described federal cocaine conspiracy, he was again arrested in Kings County, New York and charged with grand larceny in the third degree, criminal possession of stolen property in the third degree and unauthorized use of a vehicle.  When questioned about the incident, the defendant offered New York City Police ("NYPD") officers $1,000 to forget the arrest.  On November 23, 1993, Micali was convicted in Kings County, New York on a misdemeanor charge of compounding a crime in connection with his arrest on July 3, 1993 and was sentenced to three years probation.  (PSR ¶ 32).

After his release from prison in 1996 for the cocaine conspiracy conviction, the defendant violated his conditions of supervised release on several occasions.  One of the violations stemmed from the defendant's arrest in connection with a string of Automated Teller Machine (ATM) burglaries.  The defendant's vehicle matched the description of a vehicle used in those burglaries.  The police found burglary tools inside Micali's car. Thereafter, on June 11, 1997, the Massachusetts state police in conjunction with the NYPD executed a search warrant at Micali's residence and recovered approximately one pound of marijuana and two tablets of Valium.  Micali ultimately pled guilty to three of the six violation charges pending against him, including Possession of marijuana.  On November 26, 1997, Micali was sentenced to eight months custody, followed by twenty-six months supervised release. (PSR ¶ 27).

On September 2, 1998, the defendant was released from custody.  A second violation of supervised release report was issued on April 27, 2000, which contained four charges, including failure to report being questioned by a law enforcement officer, traveling outside the judicial district without permission, associating with persons engaged in crime and failing to submit a truthful monthly supervision report.  The defendant also tested positive for marijuana during random drug tests on August 31, 1998 and May 27, 1999.  After pleading guilty to the charges related to traveling outside the district and failing to report the fact that he was questioned by law enforcement, the defendant

was sentenced to nine months in custody with no supervision to follow. (PSR ¶ 28-29).

The defendant also received seven disciplinary actions while he was incarcerated between 1994 and April 2001. (PSR ¶ 30).

On September, 17, 2003, the defendant was arrested in connection with the burglaries of 14 banks and the attempts to burglarize nine banks with members of the Night Drop Crew, a criminal enterprise that had direct ties to organized crime, specifically the Gambino and Colombo Families. The defendant was a leader of the crew, and he and his co-conspirators either removed or attempted to remove bank night-deposit boxes from the outside walls of the banks, by prying them off with a crowbar or similar tools, or pulling the deposit boxes off by attaching a chain to the box and a car/truck, while others acted as lookouts. The defendant and his co-conspirators split the proceeds from these deposit boxes. The defendant was personally involved in 24 of these robberies. Since the conduct stretched from November 1993 through August 28, 2003, part of it occurred while the defendant was on supervised release. The defendant pleaded guilty in the Eastern District of New York to bank burglary conspiracy and racketeering, and was sentenced by Judge Johnson to 51 months and three years supervised release. (PSR ¶ 33-35). The defendant was released from custody in 2007, and was still on supervised release for that crime when he committed the instant offense.

On February 17, 2010, the defendant was also arrested in a controlled delivery of marijuana the night before his first status conference in the instant case. The defendant was charged with conspiracy to distribute marijuana and attempt to possess with intent to distribute marijuana. The defendant, however, was ultimately acquitted of that conduct. (PSR ¶ 37).

III. Argument

    A.   Legal Standard

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 128 S. Ct. 586, 596 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [the

4

Court] may not presume that the Guidelines range is reasonable. [The Court] must make an individualized assessment based on the facts presented." Id. at 596-97 (citation and footnote omitted).

"'When a factor is already included in the calculation of the [G]uidelines sentencing range, a judge who wishes to rely on that same factor to impose a sentence above or below the range must articulate specifically the reasons that this particular defendant's situation is different from the ordinary situation covered by the [G]uidelines calculation.'" United States v. Sindima, 488 F.3d 81, 87 (2d Cir. 2007) (citation omitted, alterations in Sindima).

   B.   Argument

The factors outlined in 18 U.S.C. § 3553(a) show that a Guidelines sentence is appropriate in this case. First, the nature of the offense to which the defendant pled guilty, see 18 U.S.C. § 3553(a)(1), is serious. While working for UTi, an international freight forwarder that screens valuable cargo for explosive traces, the defendant and his co-defendants stole valuable electronics worth over $50,000, and filled the boxes with diapers to make up for the discrepancy in the weight of the boxes. (PSR ¶ 4, 6). UTi learned about this from the recipients in Singapore and India who did not get their products. Further investigation revealed additional thefts by the defendant and his co-defendants, including theft of expensive french cream and leather jackets, which brought the total loss to $97,502. (PSR ¶ 7). The defendant's actions in stealing from the cargo that UTi was trusted to screen, demonstrate a blatant disregard for the law and for his employer's contractual obligations.

In addition, the defendant's extensive criminal history, including numerous violations of supervised release, further demonstrates a complete disregard for the law. As set forth above, the defendant continually committed crimes from 1993 through 2009. When the defendant was out on bail for his cocaine conspiracy offense, he committed an additional crime for which he was sentenced to three years probation. After serving his sentence for the cocaine conspiracy, the defendant was twice sent back to prison for violating supervised release. After the second violation, he was sentenced to nine months' imprisonment with no supervision to follow because, apparently, he was not amenable to further supervision. The defendant had seven disciplinary charges while in prison between 1994 and 2001. In 2003, the defendant was again arrested in connection with bank robberies, and subsequently served 51 months in custody during which he incurred three disciplinary violations. After he was

5

released from prison, the defendant was placed on supervised release.  And the defendant once again violated his terms of supervised release when he committed the instant offense.  While the defendant objects to the PSR's omission of the defendant's conduct on supervised release from 2007 to 2010 during which he claims there were no violations, that short period of time compared to his overall criminal history pales in comparison.  (Def. Ltr. at 2).  Accordingly, the defendant's "history and characteristics" support a Guidelines sentence.

The defendant further argues that the defendant is a changed man because of the birth of his daughter, and should therefore receive a below-Guidelines sentence or at least a sentence at the low end of the Guidelines.  (Def. Ltr. at 2).  But the defendant's extensive criminal history and inability to follow the law contradicts the defendant's claim.  Although his daughter was born in 2007, he committed the instant offense in December 2009 without any regard for the consequences of his actions.  In addition, the defendant was initially released on bond in this case.  It was his own actions -- being arrested in a controlled delivery of marijuana the night before his first status conference in the instant case -- which led him to be remanded and away from his daughter.[2]

Second, given the defendant's disregard for the law as demonstrated above, a below-Guidelines sentence would not "promote respect for the law" or "provide just punishment" in this case.  18 U.S.C. § 3553(a)(2)(A).

Third, a below-Guidelines sentence would not "afford adequate deterrence to criminal conduct."  Id. § 3553(a)(2)(B).  Over the course of the defendant's countless arrests, he has repeatedly been given bail while charges were pending and yet he did not take those opportunities to prove that he could abide by

---

[2]  Although the defendant was ultimately acquitted of that conduct, the defendant was not released on bail following the acquittal.  His attorney made a bail application before the Court, but withdrew that application upon the Court's order that a hearing take place to determine the facts of the defendant's arrest.  The government maintained at the hearing, and continues to maintain, that the defendant intentionally went to a parking lot in Staten Island to meet a man driving a trailer containing 197 pounds of marijuana concealed inside couches for the purpose of picking up the marijuana for distribution.  The defendant was arrested in a U-Haul van with a pry bar, 15 brand new laundry bags, a flashlight and two lanterns.

his bail conditions. Nor did he take the opportunity when released from any of his prison sentences to turn his life around. Rather, each time he had a chance, the defendant continued his criminal activity. See PSR at ¶¶ 20-74. Thus, a below-Guidelines sentence would not deter the defendant from future criminal conduct. Moreover, for the same reasons, anything less than a Guidelines sentence in this case is unlikely to deter him from committing "further crimes." Id. at § 3553(a)(2)(C).

IV.   Conclusion

For the reasons set forth above, the defendant should be sentenced within the applicable advisory Guidelines range of 24 to 30 months' imprisonment.

Respectfully submitted,

LORETTA E. LYNCH
United States Attorney
Eastern District of New York

By:       /s/
Celia A. Cohen
Assistant U.S. Attorney
(718) 254-6147

cc:   Albert Y. Dayan (By ECF)
      Clerk of the Court (By ECF)(NGG)